182425 May it please the Court, Michael Sussman. I'm arguing on behalf of Ms. Salinovich, the appellant. This is an appeal from a denial of Social Security benefits. The issues, can you hear? Okay, thank you. The issues on the appeal as we see it are the following. There's a treating physician doctrine which has been adopted by the courts. There's also a regulatory doctrine which has administrative support. Under that doctrine, Dr. Jalaj, J-A-L-A-J, was a pulmonologist who treated my client since 2007. In 2014-15, he again examined the client as he had been seeing her over the years, and he certified that she had very significant medical issues which would essentially keep her from the workplace due to an abundance of absenteeism which would derive from her condition. That view was discounted by the administrative proceeding and as well by the client. There is a standard of review which has been set in these cases, and that standard relates to a number of five categories. Those five categories or test standards have to be reviewed carefully. Here, reviewing each of them, first of all, the claimant is not the case of this A-L-J simply saying that the kept consulting physician should be given more weight than the treating physician, which is what we traditionally have not allowed. Here, the A-L-J says that what the treating physician did was to state a conclusion which was not based on the treating physician's own records and data given. But that's not accurate. The treating physician for a seven-year period had been doing tests with regard to the woman and her particular capacity. It was clear she was not engaged in gainful employment. It was also clear she had a substantial impairment, though that despite her severe impairment, she has residual functional capacity to perform prior job, or whether there's another job she could perform. The vocational expert testified. This is at J.A. 67 for your review. And on cross-examination, this is their burden, question 5, acknowledged that based upon her actual condition, she could not do another job. No. The vocational expert did it on the basis of a hypothetical. If there is X, Y, and Z, can a person do a job? The X, Y, and Z, though, was not specifically what your client was. No, it was. Judge, the X, Y, and Z, the only hypotheticals that were posed to the that — in that question were the breaks. Did she need breaks every 15 minutes, which was not disputed. She did need breaks every 15 minutes. And with regard to the breaks every 15 minutes and the likely absenteeism coming from her severe asthma, on those basis, she would be deemed unemployable. Those were the only specifics. And that's not contravened by Dr. Eisner. Dr. Eisner didn't say those conclusions were inaccurate. Those were the conclusions that derived both from the questionnaire that my client submitted and her own treating physicians' understanding and knowledge of her case. So I don't agree that those hypotheticals were so hypothetical. I understand you're correct. There was — there were facts that were given, but those facts were predicated on the record, which was why it was a relevant question. So with regard to the notion that she could work as a clerical standing up or sitting down for lengthy periods of time, that contravened the record. It was not — again, it was not — it was not based on someone else. It was based on this person's limitations. Although the answer was, in my opinion, such an individual may be able to perform the essential functions of the job. No, no. It goes further than that. No, I know. However, such an individual would be unable to maintain employment if they needed to take that many breaks. Question — then the vocational expert is cut off of that duration. I have nothing further. So what are we to make of that? And then on 65 — He says — Yeah. — in my opinion, I believe such an individual would be able to do the job, sort of — The question, as you correctly stated, page 62 of the record and JA 67, if she were able to work 45 minutes for each hour and then need a 15-minute break for each hour, would she be able to manage those jobs? A reference to the jobs, the alternative to teaching. I don't think anyone really thinks she could go back into a classroom given the nature of those exposures. In my opinion, such an individual may be able to perform the essential functions. However, such an individual would be unable to maintain employment. So in other words, they could theoretically do the job, but they can't maintain employment because the consequence of their condition would make them someone who no one would employ. That's how I understand that meaning. So the point is that the government, as you know, has the burden on that fifth stage, if you get to the fifth stage. That's the fifth question. And under the law, the fifth stage, they have the burden. On all of the four, we have the burden. But when you get to that fifth stage, I don't believe that would allow you to meet the burden. That's too ambiguous, at very best, to meet the burden. Now the problem—sorry, Jeff. Were you counsel? No. Yeah, so that you were not in a position to say to the ALJ and the vocational expert, let's make it be specifically this person. Right. That's part of the problem, that had you been there, you would certainly— I hope I would have done a little more artfully and gone further. There may have been some time pressure that I don't know about, but it seems like it's a little rushed, frankly. But regardless, as I see the problem here, you have an individual who was a successful teacher for a long period of time. In October of 2010, she resigned from that position because of problems relating to her asthmatic condition. The exposures that employment provided for her on a day-to-day basis were incompatible with the position. She didn't then immediately apply for a disability. She waited effectively four years to see whether there was going to be some, as I understand the record, some redress that would allow her to reenter the workforce. In fact, that just didn't happen. Her condition was better because she was at home, having radically changed her daily routine and radically changed the way she was functioning. And then that seemed to be held against her, feeling there was some contrariety between that and the medical opinion. I don't think there's a contrariety, because at the point in 1415 when they were reviewing her, she's not in the workplace. She's been out of the workplace for four years, and she's shown some manifest improvement, that's true, but it's not an improvement that would transfer into the workplace. I think that's basically our argument. I thank you for hearing it. Thank you. Thank you very much. May it please the Court. Good morning, Your Honors. Alexander Broche on behalf of Appelli, the Commissioner of Social Security. Your Honors, appellant's asthma does not constitute a disability within the meaning of the Social Security Act, and the decision of the District Court for the Northern District of New York should be affirmed for two reasons. First, the ALJ correctly assessed the medical opinion evidence. Second, the ALJ properly construed the testimony of the vocational expert. Can you discuss the vocational expert first? Sure, Your Honor. With respect to the vocational expert testimony, the administrative law judge specifically asked the vocational expert, via hypothetical questions, whether the appellant could perform her past relevant activity after assessing the residual functional capacity that she assessed. So the vocational expert was asked whether an appellant with the similar vocational profile as the appellant, who could perform light work, who was restricted to avoid concentrated exposure to respiratory irritants, and who had to avoid sounds from behind and loud hearing and loud noises that could disrupt it, whether that person could perform her past relevant work as a teacher. And the vocational expert testified that yes, such a person, such as appellant, with the very same residual functional capacity that the ALJ later assessed, could perform her past relevant work. So what are we to make of that colloquy, the last couple questions, question and answer colloquy, where the number of breaks is the issue? Right. What's happening there, Your Honors, is the administrative law judge is doing the exact task that he's meant to be doing, she's meant to be doing. She is probing and asking different hypothetical questions to assess the degrees of what level of work that can be performed. That is precisely the role of the administrative law judge. However, the appellant's argument is, with respect to vocational expert testimony, is predicated on a residual functional capacity that she desires, but not the one that was assessed by the administrative law judge here. But you say that the ALJ was doing just what it should be doing. Isn't it just confusing when the ALJ asks a hypothetical question of a vocational expert? I mean, don't we really want the ALJ to ask the vocational expert this particular person with these particular things, not hypothetical, but specific questions, so that we know whether this one, because, you know, vocational experts will give any number of answers to hypotheticals and then we're stuck trying to figure out which hypothetical fits more. Right. And in this case, Your Honors, the administrative law judge specifically asked the vocational expert on Joint Appendix, page 64, the hypothetical question, but it was the RFC that ultimately resulted in the decision. The exact residual functional capacity that the administrative law judge ultimately assessed was posed to the vocational expert. And the vocational expert testified that that specific residual functional capacity, that individual with that specific residual functional capacity could perform the past relevant work of the appellant, a teacher. And this Court has held in McIntyre v. Colvin that the testimony of a vocational expert can constitute substantial evidence, and that is precisely what we have here. This is the residual functional capacity of the appellant, which is the ability to perform light work with a limitation as to avoiding concentrated exposure to respiratory irritants and limitations with respect to hearing. And that is based predominantly on a longitudinal review of the record, including the treating physicians. Now, appellant argues that Dr. Jalalj was not accorded sufficient weight during the review. However, as the record notes, the administrative law judge carefully reviewed Dr. Jalalj's opinion and his treatment notes, and he didn't disregard Dr. Jalalj's opinion. He accorded Dr. Jalalj's opinion some weight. However, he discounted the severely restrictive portions of Dr. Jalalj's opinion that were inconsistent with the record as a whole. And that is specifically the fact that Dr. Jalalj assessed severe limitations with respect to mobility and functionality. That is not consistent with both the opinion of Dr. Eisner, the consultative examiner, and appellant's own statements. Appellant testified, and she reported that she exercised, that she used a recumbent bike, that she traveled outside without any reported respiratory protections. And all of this is consistent with the level of functionality that is not consistent with Dr. Jalalj's opinion. And Dr. Eisner's opinion further supports the administrative law judge's decision. Dr. Eisner's opinion, the consultative examiner's opinion — JUSTICE SCALIA. Was — who hired Dr. Eisner? MR. ZUNIGA. The — it's a consultative examiner by the agency, Your Honor. JUSTICE SCALIA. By the agency. So it's the kept agency doctor. MR. ZUNIGA. No, Your Honor. Dr. Eisner is a consultative examiner. JUSTICE SCALIA. Well, I understand. But our courts — and it was our court that developed the treating physician doctrine — did it because our court was very skeptical of these consultative people whom the agency hired and whom our court felt always came out the precisely skepticism by judges like Judge Winter, who was one of the ones who developed that notion, of these consultatives who were always saying coming out the same way. But, you know, that doesn't settle this case because there is evidence, you suggest, apart from the consultative physician that undercuts the treating physician. MR. ZUNIGA. Precisely, Your Honor. It's not simply a matter of a weighing of between one consultative examiner and one treating doctor. JUSTICE SCALIA. It's her testimony. MR. ZUNIGA. It's her testimony coupled with the inconsistencies in Dr. Jalal's own treatment notes, coupled with Dr. Eisner's opinion, and even coupled with her other treating doctor, Dr. Festa. You know, Dr. Festa didn't provide a specific opinion in this case, but Dr. Festa did note that the appellant was, he tried to provide accommodations in her employment. He didn't say she cannot work, period. It was he wrote a letter to her school to try to provide accommodations for her respiratory issues. And even the administrative law judge assigned great weight to Dr. Festa's opinions. So taking it together, reviewing the entire record and factoring in the administrative law judge's decision, the consultative examiner's opinion, the appellant's testimony, the vocational expert's testimony, and reviewing all that as a whole demonstrates a level of functionality that is not consistent with the requirements to be considered disabled under the Act. Thank you. JUDGE LEBEN. JA-473, Dr. Eisner's opinion, to go to your point, Judge. She should avoid any environmental stimulants that may trigger her asthma. That's Dr. Eisner's own opinion. Now, Dr. Eisner is the same person who's saying she should be going into a school where her asthma is provoked by the contact she has with other individuals on a day-to-day, moment-to-moment basis. She should be going into a file clerk position where there's dust in every environment. It's incoherent. It doesn't make any sense. If you look at JA-473, that's what is in her conclusion. She should avoid any environmental stimulants that may trigger her asthma. Now, that is inconsistent with any residual functional capacity analysis, which puts her back in a classroom. It's also inconsistent with the testimony that she should be a file clerk or in a clerical role. Moreover, when you look at the response by Dr. Jalal to the questions, he's unequivocal that she'd have more than four days per month absence if exposed to a workplace. She needs 15-minute breaks, which is not refuted by anything Eisner says. Eisner does not address the issue. She doesn't say and she doesn't testify. So we don't know what she would say with regard to that. One other point. The ALJ did not ask the questions that you were speaking to earlier, Judge Calabresi. The lawyer did ask those questions. If you read the transcript, you'll see it says attorney. The attorney is asking those questions. And the attorney is asking those questions based on the record that was developed by her treating physician, which is before you here at pages JA-477, 478, 479, the relevant portions. So the record with regard to Ms. Selinovich, nothing Ms. Selinovich said. I heard, Judge Lawyer, you mentioned, Judge Lawyer, that Ms. Selinovich's testimony undercut her application. She said she was dealing with the tasks of daily living in a self-regulated manner. In other words, she would do as much as she could at any moment, which wasn't very much according to both her and her husband's statements and testimony. She would travel very rarely. She had cut back on socialization with friends precisely because that interaction would be a trigger for her asthma. This is not a person who should be in a workplace. Thank you. Thank you very much.